McFall v. Smith.

## David McFall

v.

## Alice D. Smith.

*Malpractice— Verdict— Weight of— Issues Improperly Submitted— Hypothetical Questions.*

1. A special finding by a jury on one question of fact directly contrary to the evidence, should lessen the confidence of the court in their judgment on other points.

2. Where questions, not properly arising upon the evidence, are so

mingled before the jury with the real issue in the case as to render it doubtful upon what ground they based their verdict, the same should be set aside.

3. Hypothetical questions to experts, not fairly based upon the evidence, and which have a tendency to mislead and prejudice the jury, are to be considered by the court in determining whether a new trial should be granted.

[Opinion filed February 14, 1890.]

APPEAL from the Circuit Court of Coles County; the Hon. J. F. HUGHES, Judge, presiding.

Messrs. WILEY & NEAL, for appellant.

There can be no question but this court has, not only the right to pass upon questions of fact, but it is just as much its duty to do it as it is to pass upon questions of law, or as it was the duty of the jury to pass upon the facts in the first instance.

The rule is settled in this State that when there is no evidence to sustain a verdict, or when the verdict is manifestly against the weight of the evidence, the judgment will be reversed. Reynolds v. Lambert, 69 Ill. 495; T. U. & Western R. R. Co. v. Moore, 77 Ill. 217; Counselman et al. v. Whitehair, 14 Ill. A⌐ p. 74; Krebs v. Thomas, 12 Ill. App. 266.

The provision in the practice act that no more than two new trials shall be granted to the same party for the same cause has no application to this court. Ill. Cen. R. R. Co. v. Patterson, 93 Ill. 290; Wolbrecht v. Baumgarten, 26 Ill. 291; Stanberry v. Moore, 56 Ill. 472; Loewenthal v. Streng, 90 Ill. 74; L. S. & M. S. Ry. Co. v. Kuhlman, 18 Ill. App. 222.

Messrs. JOHN S. HALL, JAMES W. CRAIG and HORACE S. CLARK, for appellee.

The questions of fact in this case have been passed upon by four juries, forty-eight men, good and true, citizens of the same county, all hearing the whole evidence, seeing the witnesses face to face, hearing the instructions of the court and

hearing the arguments of the counsel on behalf of the appellant, learned in the law, and who stand high in their profession ; three new trials; and now without error of law insisted upon, it is asked that this court grant them another trial. The first verdict was $100, the second $1,500, the third $2,000 and the last $900, something less than the average of the four, and we insist that this ought to be the end of it, and respectfully submit to this court that the judgment should be affirmed.

CONGER, J. This was an action on the case brought by appellee against appellant, charging him with negligent and unskillful practice as a physician. Appellee recovered a verdict for $900 upon which judgment was entered.

The declaration consisted of eight counts, the substance of which appears as follows, as taken from the abstract :

First count avers that defendant was a practicing physician; that as such physician plaintiff employed him, she being about to be delivered of a child, which employment was accepted by defendant, and he so unskillfully and negligently conducted himself, that thereby the plaintiff underwent great and unnecessary pain and anguish, was greatly disordered, reduced, weakened and so remained hitherto, and has been obliged to pay divers other physicians divers sums of money, amounting to $100.

Second count same as first, except it avers the damages to plaintiff arising from defendant's negligence to be the tearing and lacerating the lower portion of plaintiff's womb, rendering her a hopeless invalid for life, causing her great pain and anguish from thence hitherto.

. The third count avers that by reason of negligence of defendant, plaintiff's perinæum was greatly torn and lacerated, causing great pain, etc.

The fourth count avers that through negligent and unskillful administration by defendant to plaintiff of anæsthetics the delivery of her child was delayed until her strength was so far exhausted and her sensibilities so far gone, and her nervous system so far stupified that she was, in consequence thereof,

greatly torn and lacerated about the vaginal orifice and womb.

Fifth count avers that when plaintiff's childbirth sickness began and she sent for defendant, he came and gave her morphine and went away, and when plaintiff sent for defendant at divers other times between the beginning of said sickness and the delivery of the child, the defendant would come, and at each time simply direct the continued dosing of the plaintiff with anæsthetics, leaving the plaintiff to suffer until her strength was exhausted, and causing her to be greatly torn and lacerated about the womb and perinæum.

Sixth count avers that defendant carelessly and negligently went away and slept until plaintiff's strength was exhausted, in consequence whereof she was greatly torn and lacerated about the womb and perinæum.

Seventh count avers that defendant so unskillfully and negligently wrenched the child from the plaintiff that she was thereby torn, etc.

Eighth count avers that at the delivery of her child plaintiff was greatly torn, etc., and that defendant carelessly went away without stitching the lacerated parts, or doing anything else looking to the care of the parts, and left plaintiff in such condition to this date.

The jury returned with their general verdict the following ten special findings, viz.:

1.   Did the giving of morphine by the defendant to the plaintiff cause any injury?   A.   Yes.

2.   Did the absence of the defendant at any time after he was first called and before the birth of the child cause any injury to the plaintiff?   A.   Yes.

3.   Did the defendant with his hands tear the perinæum of the plaintiff?   A.   No.

4.   Did the defendant after the child's head was born, forcibly pull the child from its mother without waiting for any labor-pains to assist in its expulsion?   A.   No.

5.   Was it through any fault or negligence of the defendant, that the perinæum of the plaintiff was torn?   A.   No.

6.   Was there any such tear in the perinæum as the ordinary practice of physicians in good practice required to be sewed up?   A.   Yes.

7.  Was the plaintiff injured by anything the defendant did?  A.  Yes.

8.  Was there anything in the treatment of the plaintiff by the defendant that the ordinary skill of the medical profession required defendant to do which he did not do?  A.  Yes.

9.  Was there anything done by the defendant in his treatment of the plaintiff, that the ordinary skill of the medical profession would have required him not to do?  A.  Yes.

10.  Would it have been any to the advantage of the plaintiff, if the defendant had discovered the tear in plaintiff's perinæum at the time of the birth of the child?  A.  Yes.

While the record is quite voluminous, the vital questions in the case, and the one upon which the right of recovery can be alone placed, is the charge contained in the eighth count. The physicians nearly all agree in their testimony, that if the rupture of the perinæum was as extensive as claimed, by appellee reaching into and tearing the sphincter ani, that there should have been a more thorough examination made, and a majority of the medical experts testify in such case there should have been stitches taken to bring the edges of the rupture together, while some of them think, even under such circumstances, sewing would not be necessary.

But all substantially agree, that if the rupture was no more extensive than is claimed by appellant, and did not involve the sphincter ani, then the treatment given by appellant was proper; so that in our judgment the first and really the controlling question is, did the evidence warrant the jury in finding the rupture to have been as claimed by appellee, viz.: that is, involving the sphincter ani, and therefore requiring at the hands of appellant other and further attention than he gave it.  There are seven witnesses, who testify upon this subject from personal examination, two of them appellant and appellee, before the rupture healed, and the other five from an examination of the scars left upon the person of appellee.

Appellee was blind, but testified that her sense of touch had been educated and developed, until she could with her fingers determine the direction, nature and length of the wound as accurately as one could by sight.  She says, some

three days after her child was born, she felt such a soreness and misery that she examined herself. Could tell with her finger that she was so very much swollen; that the laceration then seemed to be two or three times longer than it possibly could be. It seemed to be all of two inches. The scar (by which we understand she means the rupture) extended entirely back to the anus and seemed to be back to it—not through it, but into it. It seemed to extend into the muscle of the sphincter ani, but not through it. She also testified that the action of that muscle was positively destroyed for several days; hadn't a particle of control of it for several days, perhaps two weeks.

Mary J. Mitchell, who had been a nurse for several years, waiting upon women in childbirth, was the mother of ten children and had delivered a good many women without the assistance of a physician, testified upon this point that she had examined appellee's private parts since they had healed up—how long after the birth of the child does not appear, except she says that it was the last term of the Circuit Court. She says: " It (the scar) was about one-half inch and then it came around in a kind of a triangle like; both the triangle and the plain split would make it about one inch. It was healed up, but still it was open. Then there was another place on the right side that was torn and that was grown up into a kind of gristle in the shape of a bean and that just kind of hung there in a kind of dangle. The scar is visible, is about a half inch; the open place is about half an inch. The scar looked as if it was to the rear opening, but it had healed up. The scar is right up to the opening."

Rachel Coleman is a married woman and has examined appellee twice; she says: " She is torn from one opening to the other about as near as I can tell. The scar looks about a half inch around toward the left limb. There is a place looks as though it was a half inch right at the birth place. Then there is a place that is about as large as a common-sized bean that never has been healed up. The scar came within the thickness of a pencil or a rye straw of the anus. There is a space of say near a half inch that did not close up. The

McFall v. Smith.

scar from one opening to the other has been healed up, but the other, around toward the left limb, it has healed, of course, but has not closed up. She thinks the muscle surrounding the rectum must have been torn through."

Angelina Thompson is a married woman and has six children and states that she made an examination at the same time the two former witnesses did, and says: "There is an open rupture running diagonally from the lower part of the birth place toward the left limb, that is over a half inch, and from the end of that going toward the anus, there is a scar of half an inch; between that and the anus there is no more than the thickness of a slate pencil. There is just inside the birth place on the left side a lump about the size of a large grain of corn, that looks as if the flesh had been torn and had not gone back; it stands loose."

Upon this question appellant testifies that on Monday morning, after the child had been born on Saturday, appellee's husband came to him and told him appellee wanted to see him, that she thought she was torn. He went and made an examination. He says: "I examined her and found a light lateral rupture; my judgment then was about a half inch, a little to the left. It was a tear of the vaginal muscles, but the sphincter ani was not torn. I introduced my finger into the rectum to ascertain whether that was torn, and it was not, and this being a lateral rupture, it had a disposition to come together without stitching. If it had been straight down and involved the sphincter ani, it would have been necessary to sew it, because the muscles must be held together to heal; but it was on the side, and all you had to do was to put it in position to rest, and it would heal itself."

Dr. P. A. Kemper, a graduate of Rush Medical College, and a practicing physician since 1858, together with Dr. V. R. Bridges, a graduate of the same school and with a practice of thirty-five years, made an examination of appellee, just when does not appear, except that it was just after some former trial of the case. Dr. Kemper says:

"This was Sunday following the first trial. It was about 12 o'clock. There was light from the south window. She

was placed in a chair before this window, the parts were exposed, and the first thing after examining the external appearance was to insert the finger into the rectum to see if the sphincter ani muscle was intact. That was satisfactory and the muscle seemed to be all right. The next was to examine the space from the rectum to the fourchette, or birth place, about one and one-half inches. That space from the fourchette down, perhaps a scant three-fourths of an inch, and a little laterally, had the appearance of having been torn and healed up.

"I then introduced the speculum into the vagina and brought the mouth of the womb within the space of the speculum and examined it carefully, as I had been told by Mrs. Smith that her womb was considerably lacerated. I found that intact and all right. I then took a silver catheter about the size of an ordinary goose quill and introduced it into the bladder and the urethra. Sphincter would grip it and hold it straight, showing it was strong and all right. The external parts were all right. There was a peculiar arch of the pelvis. She would necessarily have a hard labor from the peculiar formation of the pelvic bone. Her pelvic bones are acute. The laceration was not straight down, but a little to the left. If the sphincter ani was torn through it would not heal up itself without being held together by stitches. The sphincter ani of plaintiff had never been torn through. The wound is no longer than the scar. You can not tell by the scar how deep the wound has been."

Dr. Bridges says: "Mrs. Smith was in a chair when I went over, in a position to be examined. Dr. Kemper had made his examination, and I found that the sphincter ani and the bladder, so far as I was able to determine by the introduction of my finger in the one and the catheter in the other, the sphincters were perfectly intact. My judgment is they had never been broken.

"It was in perfectly normal condition, so far as I was able to see. There was a scar; there had been a laceration of the soft parts near the vaginal septum and the anus; it had passed to the left of a direct line. The laceration was some-

McFall v. Smith.

where near three-fourths of an inch, I think a scant three-fourths from the appearance of the scar and the granulation. There is a scar to the left of the raphe, which is in everybody, about one-half inch in length, probably a scant one-half inch, that indicates union was had without any suppuration, just glued together, union by first intention. It was a clear, smooth scar, just such as you would see if a knife had passed through. Just at the top of the scar the surface would indicate there had been some healing by granulation, that is by the formation of new tissue. There is a granulated surface that may have been one-fourth of an inch and may have been less. I am sure it was not more than a quarter. So the rent was about three-fourths of an inch extending toward the left.

"I don't think the union would have been better wi'h a stitch than it is now. I don't think there could have been any improvement. There would have been no better union with stitches than there is now.

"I didn't observe any laceration on the right side. I examined it. There was no loose flesh hanging there, nothing there but what belonged there."

This was all the direct evidence there was upon this point. Some of the physicians thought that the length of the scar as testified by appellee's witnesses would indicate that the rupture involved the sphincter muscle, while others were of opinion that had such muscle been seriously torn, it would not have healed up as it did without having been sewed.

We have no hesitation in saying that from an examination of the evidence contained in the records upon this question, it is very far from satisfying us that appellee had any preponderance of testimony, but there were some other circumstances to which we have not yet alluded. It was sought to impair the testimony of Dr. Kemper, first, by some impeaching questions, and, secondly, by trying to show that he had, at the instance of appellant, sought an opportunity to examine appellee and was not, therefore, entirely impartial.

We do not care to express any opinion upon the degree that this might detract from the weight to be given to his

evidence, for if it appeared that the question of the ex'ent of the wound had been fairly passed upon by the jury unaffected by other matters which, we are inclined to think, did improperly, and to the prejudice of appellant, enter into its consideration, we should perhaps not feel warranted in interfering with their verdict.

One of the charges of improper practice was the administration of morphine prior to the birth of the child, and the jury have specially found that such administration caused an injury to appellee. The only witness in the entire record who states that it would not be good practice is Mrs. Mitchell, while every physician whose attention is called to the question, and there were six of them, says that under the circumstances such administration was proper and according to good practice. If the jury have so utterly misconceived and misapplied the testimony upon this point, it materially lessens our confidence in their judgment upon others; nor can we know how far the jury may have been influenced in their general verdict by their mistaken views upon the question of the administration of morphine.

Again, the hypothetical cases supposed in framing questions by counsel for appellee, to be put to the physicians as experts, were unfair and misleading.

It is true the rule allows counsel to frame questions upon such theory and upon such facts as he may choose, leaving it for the jury to determine whether such supposed facts are shown by the evidence or not, still, when it is apparent, upon a review of the case, that such questions as are asked have had a tendency to mislead and prejudice the jury, they should be considered in determining whether a fair trial has been had. One of these questions assumed that appellant had with his fingers, by pressing against the perinæum of appellee, torn it before the head of the child was born, and then when the child's head was born, that appellant, without waiting for another labor-pain, pulled the child from the mother. Such a theory was not warranted by the evidence. No one pretends that anything like that happened, except that appellee in the agony of child-birth imagined it, which all the physi-

cians say is not at all uncommon, while appellant and the nurse, Mrs. Smith, both say nothing of the kind happened and the jury specially found that no such thing occurred.

We refrain from further comments upon the evidence because we think this cause should go to another jury; for after a careful examination we are convinced that there has not been a fair presentation of the real question to the jury, but that matters about which appellant has clearly not been negligent and those which may be regarded as debatable, have been so mingled before the jury, as to make it doubtful, at least, upon what they finally placed their verdict. Hence it can not be said that the jury have, from the evidence, found appellant guilty upon the eighth count of the declaration, the only one, as we think, in this record, upon which a verdict could rightfully be based, and for that reason we think the court erred in not setting aside the verdict and granting a new trial. For this error of the court the judgment of the Circuit Court will be reversed and the cause remanded.

*Reversed and remanded.*